IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


TERESA SULLIVAN                                                    PLAINTIFF


        v.                          CIVIL NO. 06-5214


MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                   DEFENDANT


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

        Plaintiff Teresa Sullivan brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying her claims for period of disability and disability insurance benefits

(DIB) and supplemental security income (SSI) benefits under the provisions of Titles II and XVI

of the Social Security Act (Act).

**Procedural Background:**

        The applications for DIB and SSI presently before this court were filed on May 17, 2004,

alleging an inability to work since November 1, 2000, due to cervical dystonia and pain. (Tr. 46-

48, 160-162).  An administrative hearing was held on April 28, 2006. (Tr. 168-196). Plaintiff

was present and represented by counsel.

        By written decision dated June 12, 2006, the ALJ found that plaintiff has an impairment

or combination of impairments that are severe.  (Tr. 12).  However, after reviewing all of the

evidence presented, he determined that plaintiff's impairments do not meet or equal the level of

severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P,

Regulation No. 4.  (Tr. 13).  The ALJ found plaintiff retained the residual functional capacity (RFC) to lift and/or carry less than ten pounds frequently, ten pounds occasionally; to push and/or pull the same amount; to sit for a total of six hours in an eight-hour workday; to stand and/or walk a total of two hours in an eight-hour workday; to frequently bend and occasionally squat, climb, reach above and stoop; to avoid crawling, crouching or kneeling; to tolerate moderate exposure to dust; and  to avoid exposure to unprotected heights, moving machinery, marked temperature changes, driving and exposure to fumes and gases.  Plaintiff was also restricted from looking straight down and turning her neck to the right. (Tr. 13).  With the help of vocational expert testimony, the ALJ determined there were a significant number of jobs in the national economy that plaintiff could perform. (Tr. 16-17).

Plaintiff appealed the decision of the ALJ to the Appeals Council. Plaintiff's request for review of the hearing decision by the Appeals Council was denied on September 27, 2006. (Tr. 2-4). When the Appeals Council declined review, the ALJ's decision became the final action of the Commissioner.  Plaintiff now seeks judicial review of that decision. (Doc. #1).  Both parties filed appeal briefs and this case is before the undersigned for report and recommendation. (Doc. # 8,9).

**Evidence Presented:**

At the administrative hearing before the ALJ on April 28, 2006, 2006, plaintiff was forty-seven year of age and obtained and eleventh grade education. (Tr. 170-171).  The record reveals plaintiff's past relevant work consists of work as a waitress. (Tr. 64-67,174).

The pertinent medical evidence in this case reflects the following.  On May 30, 2001, plaintiff returned for a follow-up appointment with Dr. John A. Huskins. (Tr. 124).  Plaintiff

AO72A
(Rev. 8/82)

reported some neck and back pain and requested medication to treat this pain. Upon examination, Dr. Huskins noted plaintiff's extremities were symmetrical; that she had good pulses and no edema; that she exhibited no motor or sensory loss; and that she had some paraspinous muscle spasm along the cervical spine. Plaintiff was diagnosed with neck and back pain and family planning. Plaintiff was prescribed Flexeril for her back pain and instructed her to return in forty-eight hours if there was no improvement.

Progress notes dated April 2, 2002, report plaintiff's complaints of a continued head cold and chest congestion. (Tr. 136). Plaintiff was diagnosed with sinusitis and bronchitis and given Tequin and Endal HD Plus.

On April 23, 2002, plaintiff sought treatment from Dr. Minh-Tam Dang. (Tr. 133). Dr. Dang noted plaintiff had not been to his office in over two years. Plaintiff reported that the injection she received did not help at first but finally worked very well for two years. Plaintiff reported over the past two weeks she started to have problems with her neck again. Plaintiff reported an inability to move her neck and that her pain was mainly in the left neck area close to the shoulder.

Upon examination, Dr. Dang noted plaintiff tilted her head to the lift side but was not able to move it to the right side. He noted turning plaintiff's head to the right caused a lot of pain. Palpation did not show any muscle contraction. Dr. Dang noted plaintiff's trapezius muscle showed no tension or twisting; that a cranial nerve examination was normal; that there was no Horner's Syndrome or Spruling sign; and that her upper extremities were normal. Dr. Dang's impression states neck pain most likely osteoarthritic joint pain and secondary torticollis.

AO72A
(Rev. 8/82)

Plaintiff was given a local injection of Triamcinolone mixed with Lidocaine and instructed to take one Ibuprofen four times a day with food.

Progress notes dated September 26, 2002, report plaintiff was in for her yearly physical. (Tr. 134). Plaintiff reported she had been doing real good on everything. Dr. Robert Hull noted the only thing plaintiff had a problem with was smoking a package and a half of cigarettes a day. After examining plaintiff, Dr. Hull diagnosed plaintiff with a menstrual disorder and nicotine dependency.

Progress notes dated November 4, 2002, report plaintiff had done well for eight months but over the last few weeks started having a lot of pain in her neck whenever she tried to move her head. (Tr. 132). Plaintiff reported she experienced more pain on the left side. Plaintiff reported she had recently lost her job and was trying to find another job.

 Upon examination, Dr. Dang noted plaintiff had pain in her neck with more pain when her head was moved to the left side. Dr. Dang observed mild torticollis. Flexion, extension, tilting or rotation of her neck was very painful. Dr. Dang noted plaintiff's motor function and coordination function were normal. Dr. Dang diagnosed plaintiff with c-spine degenerative bone and disc disease, osteoarthritis with neck pain and secondary torticollis. Plaintiff was given an injection of Triamcinolone with Xylocaine and instructed to take over-the-counter Ibuprofen four times a day. Plaintiff was to return for a follow-up appointment in a few weeks.

Progress notes dated January 15, 2003, report plaintiff's complaints that her head had become more painful. (Tr. 131). Plaintiff reported her neck twisted to the left side and that it was very painful preventing her from working as a waitress. Dr. Dang noted he had given plaintiff an injection in November and that it helped for a while but now the problem was getting worse.

4

Dr. Dang noted he had given plaintiff Botox in the past and that it had really worked but plaintiff reported she did not have the finances to buy Botox.

Upon examination, Dr. Dang noted plaintiff is "fairly thin and looks painful with her neck." Dr. Dang noted plaintiff's head and neck were twisted to the left side. Plaintiff's SCN and the trapezius muscles were tense but plaintiff could slowly move her head to the right but complained of quite a bit of pain. Plaintiff was diagnosed with torticollis head turning to the left and c-spine degenerative bone and disc disease. Dr. Dang noted that he told plaintiff to buy Botox so that he could administer it. Since she reported an inability to afford Botox, Dr. Dang gave her an injection of Triamcinolone with Xylociane.

On February 24, 2003, plaintiff reported increasing pain in her neck. (Tr. 130). Plaintiff reported at times when she tried to turn her neck to the right side it would twist back to the left side. Upon examination, Dr. Dang noted plaintiff had significant torticollis. The SCM and capitus muscles on the left side were painful on palpation. Plaintiff's cranial nerve, motor function and coordination function were normal. Plaintiff was diagnosed with torticollis head turning to the left and c-spine degenerative bone and disc disease.

Progress notes dated March 5, 2003, report plaintiff's complaints of a lot of neck pain/torticollis. (Tr. 129). Plaintiff reported her head kept twisting and locking to the left side. Upon examination, Dr. Dang noted almost the entire muscle on the left side of plaintiff's neck was tender and there was pain to palpation. Dr. Dang noted the trapezius and the sternocleidomastoid muscles were very tender and easy to palpate. Dr. Dang noted he was not sure if the sternohyoid was painful. Plaintiff brought in Botox and Dr. Dang administered it by

5

injecting in five areas. Dr. Dang instructed plaintiff to call to let him know how she was doing. He also recommended plaintiff use some heat packs if the areas became swollen.

In progress notes dated October 29, 2003, plaintiff reported the Botox injection helped for many months but she was starting to have the twisting of her neck to the left again. (Tr. 128). Plaintiff reported this was very painful. Upon examination, Dr. Dang noted plaintiff's SCM was very tense and painful and her neck twisted to the left side.  Any palpation or turning of plaintiff's neck was painful.  Plaintiff's cranial nerves, motor function and coordination function were normal.  Plaintiff deep tendon reflexes were symmetrical on both sides. Dr. Dang noted a previous MRI of plaintiff's C-spine was normal. Dr. Dang asked plaintiff to get Botox and  bring it to him to administer.  Plaintiff was given a local injection of Kenalog with Lidocaine.

Progress notes dated November 26, 2003, report plaintiff's complaints of a lot of pain and twisting of her left neck. (Tr. 127). Dr. Dang noted plaintiff was thin with severe near sighted vision. He observed plaintiff's head was almost always curved to the left side and that there was tension of the SCM and trapezius. Plaintiff brought in Botox to be administered. Plaintiff was instructed to call in one week to report how she was doing.

On May 10, 2004, plaintiff had an initial consultation with Dr. Michael W. Morse. (Tr. 144).  Dr. Morse noted he had Dr. Dang's records regarding plaintiff's treatment. Dr. Morse opined plaintiff was disabled from dystonia because of pain and embarrassment. Dr. Morse indicated plaintiff could not go out in public and could not work. At the time of the consultation, plaintiff was taking Ibuprofen and reported smoking. Upon examination, Dr. Morse noted plaintiff's neck was supple. He found plaintiff's muscle strength and tone to be normal in both the upper and lower extremities. Dr. Morse noted plaintiff had cervical dystonia with a chin turn

6

to the right and head tilt to the left and mild retrocollis. He found plaintiff's gait and station to be normal.  Plaintiff's finger-nose-finger, arm roll and finger movements were all normal. Dr. Morse advised plaintiff to find an attorney to help her get disability. He also gave her an injection.

Progress notes dated September 9, 2004, report plaintiff's request to receive a Botox injection. (Tr. 143). Dr. Morse noted plaintiff was in the process of applying for disability and that he supported this decision. Dr. Morse administered the Botox injection and instructed her to return for a follow-up in thirteen weeks.

On October 18, 2004, Dr. Morse completed a RFC Questionnaire. (Tr. 140-142). Dr. Morse opined plaintiff could sit, stand and walk eight hours in an eight-hour workday but could only work for one hour during the workday. Dr. Morse opined plaintiff could lift and/or carry twenty pounds occasionally, up to ten pounds frequently. He found plaintiff could use her hands for repetitive action such as simple grasping, pushing/pulling and fine manipulation; however he also found plaintiff's disorder would limit repetitive hand action. (Tr. 141).  Dr. Morse opined plaintiff could frequently bend, occasionally squat, climb, reach above and stoop but could never crawl, crouch or kneel. Dr. Morse opined plaintiff could never tolerate exposure to unprotected heights, being around moving machinery, exposure to marked temperature changes, driving, exposure to dust, fumes and gases and exposure to noise. Dr. Morse indicated muscle spasm was the objective sign of pain. He further opined plaintiff's pain was "moderate (could be tolerated but would cause marked handicap in the performance of the activity precipitation the pain)." Dr. Morse remarked that patients with this diagnosis typically are unable to work.

AO72A
(Rev. 8/82)

Dr. Morse also completed a History and Diagnosis questionnaire on October 18, 2004. (Tr. 138-139). Dr. Morse indicated he was treating plaintiff for cervical dystonia and painful spasms in her neck. Dr. Morse indicated plaintiff had constant severe neck pain and spasm. Dr. Morse opined plaintiff did not have some degree of functional overlay.

Progress notes dated December 14, 2004, report the Botox had been somewhat helpful. Plaintiff reported more pain in the left trapezius. Dr. Morse indicated plaintiff tolerated another injection well. She was to return in thirteen weeks for a follow-up.

In progress notes dated June 7, 2005, Dr. Morse noted that the Botox injections had been somewhat effective. (Tr. 157). Dr. Morse gave plaintiff another injection and noted she tolerated it well.

On December 14, 2005, Dr. Morse noted plaintiff pays for the Botox injections herself and that Botox is the only effective therapy. (Tr. 156). Dr. Morse noted he gave plaintiff an injection that she tolerated well. She was to return to his office as needed.

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have

8

decided the case differently.  *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § § 423(d)(3), 1382(3)(c).  A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience.  *See* 20 C.F.R. §§ 404.1520, 416.920.  Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work

AO72A
(Rev. 8/82)

experience in light of her residual functional capacity. *See McCoy v. Schwieker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. §§ 404.1520, 416.920.

**Discussion:**

We first address the ALJ's assessment of plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id.* As the United States Court of Appeals for the Eighth Circuit recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart,* 314 F.3d 964, 966 (8th Cir. 2003).

Plaintiff argues that the ALJ failed to properly analyze the ALJ's subjective complaints. "[Sullivan's] subjective complaints may be discounted if there are inconsistencies in the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). We will defer to an ALJ's credibility finding as long as the "ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001) (quoting *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990)). After reviewing the record, we believe that the ALJ adequately evaluated the factors set forth in *Polaski*, and conclude there is substantial evidence supporting his determination that plaintiff's complaints were not fully credible. The

10

testimony presented at the hearing as well as the medical evidence contained in the record are inconsistent with plaintiff's allegations of disability.

Plaintiff alleges she is unable to work due to cervical dystonia[1] and the pain and spasms resulting from this disorder. A review of the medical evidence reveals that in April of 2002 plaintiff returned to Dr. Dang's office with complaints of neck pain. Dr. Dang noted plaintiff had not been in his office for almost two years and that plaintiff reported the injection she received two years ago worked up until two weeks prior to the visit. In September of 2002, plaintiff reported to Dr. Hull that she was doing good. At that time, Dr. Hull noted plaintiff had a problem with smoking and a menstrual disorder. Plaintiff did not seek treatment for neck pain until November of 2002 and received an injection. The records revealed plaintiff received further injections for neck pain in January of 2003, March of 2003, October of 2003, November of 2003, May of 2004, September of 2004, December of 2004, June of 2005, and December of 2005. While the record clearly establishes plaintiff does have pain associated with her impairment the medical evidence indicates the injections have helped relieve her pain for months at a time. *See Brown v. Barnhart,* 390 F.3d 535, 540 (8th Cir.2004) (holding that impairments controllable or amendable to treatment do not support a finding of total disability). Further, the evidence reveals plaintiff's treating physicians have instructed plaintiff to take over-the-counter medication for her breakthrough pain in between injections. *See Harris v. Barnhart,* 356 F.3d 926, 930 (8th

---

[1]Cervical dystonia, a focal dystonia, affects the region of the neck also called torticollis which often begins with a pulling sensation followed by sustained torsion and deviation of the head and neck. *see* The Merck Manual of Diagnosis and Therapy 1495 (16th ed. 1992) (Robert Berkow, M.D. et al. eds.). Injections of purified botulinum, a toxin, to the affected muscle groups every three to six months helps to weaken the strength of the involuntary contractions. *Id.* However, the fundamental neural mechanisms generating the dystonic movements remain unaffected. *Id.*

AO72A
(Rev. 8/82)

Cir.2004) (determining that claimant's use of nonprescription pain medication is inconsistent with allegation of disabling pain).

Plaintiff's subjective complaints are also inconsistent with evidence regarding her daily activities.  In a Supplemental Interview Outline dated May 21, 2004, plaintiff reported she was able to take care of her personal needs; to perform most household chores including gardening work; to shop and do errands; to prepare meals, drive and walk for errands and exercise; and to watch television, read, visit with friends and relatives and play with her daughter. (Tr. 81-82).  Plaintiff even indicated that since the onset of her alleged disability that her average day "hasn't really changed, though I don't work outside the home anymore." (Tr. 84). The ALJ properly understood this to mean that plaintiff was able to physically engage in activities of daily living.  This level of activity belies plaintiff's complaints of pain and limitation and the Eighth Circuit has consistently held that the ability to perform such activities contradicts a plaintiff's subjective allegations of disability.  See *Cruze v. Chater,* 85 F.3d 1320, 1324 (8th Cir.1996) (mowed lawn, shopped, odds jobs and visits town); *See Polaski* at 1322.  Further, there is no indication that there has been a worsening of plaintiff's condition since plaintiff completed the Supplemental Interview Outline.  In fact, the medical evidence indicates she received fewer injections in 2004 and 2005 as compared to her complaints of neck pain in 2003.

Although plaintiff contends that she could not afford the Botox injection or muscle relaxers, plaintiff has put forth no evidence to show that she has sought low-cost medical treatment or been denied treatment, due to her lack of funds.  *Murphy v. Sullivan*, 953 F.3d 383, 386-87 (8th Cir. 1992) (holding that lack of evidence that plaintiff sought low-cost medical treatment from her doctor, clinics, or hospitals does not support plaintiff's contention of financial

hardship). Further, despite claiming an inability to afford medical treatment the record reflects plaintiff continues to be able to afford to smoke. As such, we cannot say that her financial situation prevented her from receiving medical treatment.

The ALJ also considered the testimony of plaintiff's husband. After hearing his testimony, however, the ALJ properly concluded that his testimony was not fully credible because he had an interest in the outcome of the case. As the testimony of family members and friends need only be given consideration and need not be considered credible, the ALJ properly discredited the testimony of the witness. *Lawrence v. Chater*, 107 F.3d 674, 677 (8th Cir. 1997).

Therefore, although it is clear that plaintiff has some limitations, she has not established that she is unable to engage in any gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning her daily activities support plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

We will next discuss the ALJ's RFC determination. It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. *Id*. This includes medical records, observations of treating

13

physicians and others, and the claimant's own descriptions of his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

Plaintiff argues that the ALJ did not give proper weight to Dr. Morse's RFC assessment and opinion that plaintiff was disabled and unable to work. Generally, an ALJ is obliged to give controlling weight to a treating physician's medical opinions that are supported by the record. *See Randolph v. Barnhart,* 386 F.3d 835, 839 (8th Cir.2004); 20 C.F.R. § 404.1527(d)(2). A medical source opinion that an applicant is "disabled" or "unable to work," however, involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight. *See Stormo v. Barnhart,* 377 F.3d 801, 805 (8th Cir. 2004)("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." (internal marks omitted)); 20 C.F.R. § 404.1527(e)(1). Further, although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner. *See* 20 C.F.R. § 404.1527(e)(2). Thus, to the extent that the ALJ discredited Dr. Morse's conclusions that plaintiff could not work, he rightly did so.

14

With regard to the ALJ disregarding some of the findings made in Dr. Morse's October 2004 RFC Questionnaire, we find the ALJ properly addressed the weight he gave to Dr. Morse and his reasoning for discounting some of Dr. Morse's findings.  Specifically, the ALJ noted plaintiff testified that she was able to use both hands and that while her left arm did have pain her right arm was okay and she was able to use her left arm. Dr. Morse's own May of 2004 treatment notes  indicate plaintiff's fine finger movements were normal.  With regard to dust and noise limitations, plaintiff testified that she could tolerate the dust in an office and that noise did not bother her. Therefore based on the record as a whole, we find the ALJ properly addressed the weight he gave to Dr. Morse's opinion and that there is substantial evidence of record to support his RFC findings.

Next, we look to the ALJ's determination that plaintiff could perform substantial gainful employment within the national economy. We find that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole.  *See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996).  Accordingly, we find that the vocational expert's testimony constitutes substantial evidence supporting the ALJ's conclusion that plaintiff is not disabled as she is able to perform other work in the national economy.  *See Pickney*, 96 F.3d at 296 (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence). Further, we find the ALJ elicited a reasonable explanation for the conflict between the vocational expert testimony and the Dictionary of Occupational Titles (DOT) prior to relying on the vocational expert's testimony. *Renfrow v. Astrue*, —F.3d—, WL

15

2296409, *2 -3 (8th Cir. 2007) (ALJ required to ask vocational expert whether there was a conflict between the testimony and DOT and to obtain an explanation for any such conflict).

Finally, we reject plaintiff's contention that the ALJ failed to fully and fairly develop the record. While an ALJ is required to develop the record fully and fairly even when a claimant has an attorney, *See Freeman v. Apfel,* 208 F.3d 687, 692 (8th Cir.2000) (ALJ only must order consultative examination when it is necessary for an informed decision), the record before the ALJ contained the evidence required to make a full and informed decision. *See Strongson v. Barnhart,* 361 F.3d 1066, 1071-72 (8th Cir.2004) (ALJ must develop record fully and fairly to ensure it includes evidence from treating physician, or at least examining physician, addressing impairments at issue).

**Conclusion:**

Based on the foregoing, we recommend affirming the ALJ's decision, and dismissing plaintiff's case with prejudice. **The parties have ten days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 7th day of September 2007.

/s/   *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

16

17